UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------x

N-N, et al.,

                   Plaintiffs,           **MEMORANDUM & ORDER**
                                          19-CV-5295(EK)

        -against-

ALEJANDRO MAYORKAS, et al.,

                   Defendants.

-----------------------------------x
ERIC KOMITEE, United States District Judge:

        Plaintiffs are petitioners for "U nonimmigrant status," which is available to victims of certain types of crimes who assist U.S. law enforcement. They bring suit against the Secretary of Homeland Security, the Director of U.S. Citizenship and Immigration Services ("USCIS"), and others, challenging agency delays in adjudicating their visa applications and associated applications for employment authorization. Plaintiffs seek declaratory, injunctive, and mandamus relief directing USCIS to adjudicate their requests for employment authorization, adjudicate their eligibility for U visas, and issue interim employment authorization documents to those who submitted applications before January 17, 2017.

## I.   Statutory and Regulatory Background

        Congress established the U visa program as part of the Victims of Trafficking and Violence Protection Act of 2000, Pub.

L. 106-386, 114 Stat. 1464, which amended the Immigration and
Nationality Act ("INA").  The visa is available to victims of
specified crimes who cooperate with law enforcement authorities
in the investigation or prosecution of those crimes.  *See*
8 U.S.C. § 1101(a)(15)(U).  The purpose of the program is to
"strengthen the ability of law enforcement agencies to detect,
investigate, and prosecute cases of domestic violence, sexual
assault, trafficking of aliens, and [certain] other crimes
. . . , while offering protection to victims of such offenses in
keeping with the humanitarian interests of the United States."
Pub. L. 106-386 at § 1513(a)(2)(A).

A U visa serves two purposes.  First, it accords the
applicant lawful temporary resident status.  Second, it
authorizes the applicant to work in the United States during the
life of the U visa.  Importantly, however, receipt of a U visa
is not the only means to obtain these benefits.  As set out
below, the relevant statutes and regulations contemplate certain
alternative pathways for applicants to secure employment
authorization *before* receiving a U visa.  It is the
administration of these interim alternatives (or the lack of
such administration) that Plaintiffs challenge here.

To begin the application process for a U visa, a
petitioner must complete a Form I-918 Petition for U
Nonimmigrant Status.  *See* USCIS Form I-918, Instructions for

Petition for U Nonimmigrant Status and Supplement A, Petition for Qualifying Family Member of U-1 Recipient.[1]  The petition must include two certifications:  one signed by the petitioner, describing the criminal activity to which they fell victim; and the other signed by a law enforcement officer or similar official, attesting to the petitioner's cooperation.  8 C.F.R. § 214.14(c)(2)(i), (iii).  USCIS's Vermont and Nebraska Service Centers are jointly responsible for processing U visa petitions.[2]

USCIS regulations provide that when a U visa petition is submitted, the agency will complete a "de novo review of the petition and evidence," and "issue a written decision approving or denying Form I-918."  8 C.F.R. § 214.14(c)(5).  "If USCIS determines that the petitioner has met the requirements for U-1 nonimmigrant status, USCIS will approve Form I-918."  8 C.F.R. § 214.14(c)(5)(i).  The petitioner will then receive lawful nonimmigrant status and employment authorization for up to four years.  8 U.S.C. § 1184(p)(3)(B), (p)(6); 8 C.F.R. § 274a.12(a)(19).

---

[1] https://www.uscis.gov/sites/default/files/document/forms/i-918instr.pdf (last visited May 5, 2021).

[2] *See* USCIS, U Nonimmigrant Status Program Updates, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-criminal-activity-u-nonimmigrant-status/u-nonimmigrant-status-program-updates (last visited May 5, 2021).

As relevant here, the petition for a U visa proceeds through four stages. These stages are the product of multiple statutory and regulatory pronouncements, as discussed below. A petitioner's entitlement to employment authorization (or the lack thereof) varies by law at each stage. The stages can be summarized as follows:

*Stage One: Application filed, but not yet reviewed.* After a petitioner files a U visa application, but before USCIS review has begun, the petitioner remains ineligible for employment authorization. USCIS reviews petitions on a first-in, first-out basis, so there is a delay between the time of application and review. During this review, the petitioner is still vulnerable to removal, but may be granted — as a matter of discretion — a stay of removal pursuant to 8 C.F.R. § 241.6(a) and 8 C.F.R. § 1241.6(a).

*Stage Two: Petition determined to be "bona fide," but not yet adjudicated.* In 2008, Congress adopted 8 U.S.C. § 1184(p)(6), which conferred certain authority on USCIS to issue employment authorization to U visa applicants while they await a determination of their petitions. *See* Pub. L. 110-457, 122 Stat. 5044. Specifically, Section 1184(p)(6) provides, in relevant part, that "the Secretary [of Homeland Security] may grant work authorization to any alien who has a pending, bona

fide application for nonimmigrant status under section 1101(a)(15)(U) of this title."

Congress did not, however, define what constitutes a "bona fide" application, and USCIS has issued no implementing regulations under this part of the statute. *E.g.*, *Uranga v. U.S. Citizenship & Immigr. Servs.*, 490 F. Supp. 3d 86, 100 (D.D.C. 2020). Nor does USCIS evaluate, in practice, whether pending applications are "bona fide." Consequently, applicants do not receive employment authorization documents ("EADs") at this stage, even though the agency has discretion to issue them. Instead, the agency considers whether to grant an EAD to a U visa petitioner only after the petition has been processed and reviewed and a petitioner is determined eligible. *See* Complaint ¶ 55, ECF No. 1 ("Compl.").

*Stage Three: Waitlist.* Even after USCIS reviews a petition and determines that the petitioner is eligible, the U visa does not issue immediately. This is because in 2008, Congress imposed a statutory cap of 10,000 new U visas that may be issued per year. *See* 8 U.S.C. § 1184(p)(2)(A). Individuals who are determined by USCIS to be eligible for a U visa but do not receive one "due solely to the cap" are placed on a waitlist

and granted "deferred action" for immigration purposes.[3]
8 C.F.R. § 214.14(d)(2). Applicants on the waitlist do become
eligible for EADs: USCIS has adopted a regulation providing
that the agency "in its discretion, may authorize employment for
[wait-listed] petitioners and qualifying family members." *Id*.
This is the first stage at which USCIS currently issues EADs to
U visa applicants.

      *Stage Four: U visa issued.* A petitioner who is
approved for *and issued* a U visa receives lawful nonimmigrant
status for up to four years, with the potential for an extension
in certain cases. *See* 8 U.S.C. § 1184(p)(6). The U visa holder
is also statutorily entitled to an EAD incident to their status.
*See* 8 U.S.C. § 1184(p)(3)(B) ("[T]he Attorney General shall,
during the period those aliens are in lawful temporary resident
status under [the U visa program], provide the aliens with
employment authorization."). USCIS regulations require this
employment authorization to issue "automatically." 8 C.F.R.
§ 214.14(c)(7).

## A. The 2017 Regulatory Repeal

      Importantly, the background regulations governing
USCIS's obligation to review EAD applications changed during the

---

[3] "Deferred action" is "an act of administrative convenience to the
government which gives some cases lower priority" for removal proceedings.
8 C.F.R. § 274a.12(c)(14).

period covered by the Complaint.  Plaintiffs read a prior version of 8 C.F.R. § 274a.13 — which was effective until January 17, 2017 — to have *required* USCIS, in certain circumstances, to issue EADs before deciding U visa eligibility, if the agency could not (or did not) render a U visa determination quickly enough.  That prior regulation provided that "USCIS will adjudicate the [EAD] application within 90 days from the date of receipt of the application," and that "[f]ailure to complete the adjudication within 90 days will result in the grant of an employment authorization document for a period not to exceed 240 days."  8 C.F.R. § 274a.13(d) (repeal effective January 17, 2017).[4]  While this regulation was in effect, a petitioner seeking a U visa could simultaneously request an EAD simply by checking "yes" where prompted on the I-918 Form.  The regulation was revised effective January 17, 2017, however, and no longer includes any specific time period for adjudication of applications for EADs.

## II.  Factual Background and Plaintiffs' Contentions

The following facts are taken from the Complaint and presumed to be true unless otherwise stated.  Plaintiffs filed U visa petitions and accompanying applications for EADs between

---

[4] *See* USCIS, Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. 82, 398 (Nov. 18, 2016) (final rule eliminating interim EADs).

August 2015 and January 2018, but USCIS has not yet adjudicated those petitions.[5]  The thirteen named Plaintiffs seek to represent a class of similarly situated U visa petitioners that they estimate "exceeds 100,000 individuals."  Compl. ¶ 140.

The number of petitioners determined to be eligible for U visas each year regularly exceeds the statutory cap.  *Id.* ¶ 29.  Plaintiffs allege that USCIS has nevertheless cut the annual number of waitlist adjudications, causing the number of pending (pre-waitlist) U visa petitions to "balloon[] from just over 25,000 in fiscal year 2014 to over 125,000 in fiscal year 2018."  *Id.* ¶ 49.  As a result, the processing time for a U visa petition for placement on the waitlist now exceeds four years. *Id.* ¶ 44.  This, in turn, prolongs the time that it takes for a petitioner to become eligible to receive an EAD — i.e., to move from Stage Two to Stage Three in the taxonomy above — because USCIS does not adjudicate requests for EADs until the petitioner has been approved and placed on the waitlist.

---

[5] Plaintiffs' applications were all filed between August 2015, Compl. ¶¶ 65 (N-N); 75 (G-V-R), and January 2018, *id.* ¶ 91 (N-P-G).  The named Plaintiffs are proposed representatives of putative sub-classes that are defined, in part, by the dates that Plaintiffs filed their petitions.  The proposed "Pre-January 17, 2017 EAD Application Subclass" includes individuals whose petitions were filed prior to January 17, 2017; the proposed "Multi-Year U-Status Petition Subclass" includes individuals who filed a U-status petition before September 17, 2017, i.e., at least two years before the Complaint was filed.  *Id.* ¶ 138.  Plaintiffs have not moved for class certification at this stage.

As explained above, USCIS currently administers two paths to employment authorization:  receipt of a U visa or, in the agency's discretion, placement on the waitlist.  Plaintiffs challenge USCIS's administration of this scheme on various grounds.

First, Plaintiffs request that USCIS open a third path to employment authorization — at Stage Two.  *See* Counts II and V of the Complaint.  *Id.* ¶¶ 155-62; 178-84.  Plaintiffs contend, in these counts, that Defendants are obligated to ascertain whether a U visa application is "bona fide" and, on that basis, adjudicate their pre-waitlist EAD applications pursuant to 8 U.S.C. § 1184(p)(6).  Plaintiffs claim that in failing to make the "bona fide" determination, Defendants have unlawfully withheld agency action under the Administrative Procedures Act ("APA").  Compl. ¶¶ 156-58.

Plaintiffs also contend, in Count I, that Defendants have violated the APA by failing to make waitlist determinations (and thus EAD decisions) within a reasonable time, despite their "nondiscretionary obligation" to do so under 8 C.F.R. § 214.14(d)(2).  In Count IV, they ask the Court to issue a writ of mandamus compelling the Defendants to adjudicate petitioners' admission to the U visa waitlist sooner.  Compl. ¶¶ 146, 177. (Put differently, these counts challenge the agency's failure to push applicants from State Two to Stage Three more

expeditiously.)  By placing "individuals on the waiting list only once it is clear they will soon receive U visa status," Plaintiffs contend, Defendants have unreasonably (and unlawfully) delayed agency action.  *Id.*  ¶¶ 151-52 (citing 5 U.S.C. §§ 555(b), 706(1)).

Finally, Plaintiffs claim in Counts III and VI of the Complaint that the petitioners who applied for EADs prior to January 17, 2017 are entitled to immediate work authorization because USCIS failed to meet the ninety-day deadline that existed under the version of 8 C.F.R. § 274a.13(d) that was effective when they applied.  *See* Compl. ¶¶ 163-70; 185-90. They argue that Defendants unlawfully withheld agency action by failing to comply with their own regulation, and seek a writ of mandamus directing the agency to issue EADs now.  *Id*. ¶¶ 165-68, 185-90.

Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) (lack of jurisdiction), 12(b)(3) (improper venue), and 12(b)(6) (failure to state a claim).  They contend that certain Plaintiffs' claims have been mooted by agency action following the filing of this case; that the Eastern District of New York is no longer the proper venue for this action; and that the remaining causes of action should be dismissed for lack of subject matter jurisdiction and/or failure to state a claim.  They also request that, should I decline to

dismiss for improper venue, I exercise my discretion to transfer the case to the United States District Court for the District of Columbia.

### III. Legal Standards

On a motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction — applicable to a claim of mootness — a court must dismiss if it "lacks the statutory or constitutional power to adjudicate" the relevant claim. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The standards for dismissal under Federal Rules 12(b)(1) and 12(b)(6) are, for the most part, "substantively identical," *see Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003), except that in a Rule 12(b)(1) motion, the party invoking the court's jurisdiction bears the burden of proof by a preponderance of the evidence, *see Makarova*, 201 F.3d at 113. Additionally, courts evaluating Rule 12(b)(1) motions "may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits." *Zappia Middle E. Contr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

In reviewing a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *E.g., Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113

(2d Cir. 2013). However, only "a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 476 (2d Cir. 2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. A pleading must offer more than a "formulaic recitation of the elements of a cause of action," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

On a motion to dismiss for improper venue under Rule 12(b)(3), a court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Lesniewski v. Triton EP LLC*, No. 07-CV-2186, 2008 WL 11449071, at *2 (E.D.N.Y. March 24, 2008). In ruling on the motion, however, a court may rely on facts and consider documents outside the complaint. *See Friedman v. Schwartz*, No. 08-CV-2801, 2009 WL 701111, at *5 (E.D.N.Y. Mar. 13, 2009).

## IV.  Discussion

### A.   The claims of plaintiffs N-N and G-V-R are moot because their visa applications have been adjudicated

Defendants argue that plaintiffs N-N and G-V-R no longer present a live case or controversy because their U visa petitions have been adjudicated in the time since the Complaint was filed.  Both N-N and G-V-R have been placed on the U visa waitlist and received employment authorization.  *See* Defendants' Opening Brief at 12, ECF No. 24 ("Defs.' Br."); Declaration of Alex Weinberg, Exs. A-D, ECF Nos. 24-1, 24-2, 24-3, 24-4, 24-5.

The jurisdiction of Article III courts is limited to "cases" and "controversies."  U.S. Const., Art. III § 2.  A case may proceed if a plaintiff has a "live individual case," meaning that the "plaintiff [has] a stake and the court could grant relief."  *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160-61 (2016).  "If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot."  *Id.* (quoting *Genesis Healthcare Corp. v. Symczyk,* 569 U.S. 66, 72 (2013)).

It is clear at this point (and Plaintiffs do not dispute) that the alleged wrongful conduct inflicted on N-N and G-V-R has been remedied.  Through this action, Plaintiffs seek injunctive and declaratory relief that would compel Defendants

to timely determine their eligibility for placement on the U visa waitlist and to timely adjudicate their employment authorization applications. Because N-N and G-V-R's petitions and EAD applications were already adjudicated, they no longer have a personal stake in the relief sought. *See Alharbi v. Miller*, 368 F. Supp. 3d 527, 550 (E.D.N.Y. 2019) ("At this point, [plaintiffs] have been issued their immigrant visas, which is the relief they sought in the amended complaint. There is nothing more that the Court can order defendants to do with respect to those plaintiffs.").

Plaintiffs argue, however, that N-N and G-V-R should remain named Plaintiffs because they are putative class representatives. *See* Plaintiffs' Brief in Opposition at 5-7, ECF No. 25 ("Pls.' Br."). In general, potential class representatives must have individual standing at the time the class is certified. *See E. Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403 (1977) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks omitted)); *see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 199 (2d Cir. 2005). Only after a class is certified will the plaintiff's status as class representative preserve an otherwise moot claim — allowing that plaintiff to continue to

represent the interests of others even after there is no
prospect of individual recovery. *Comer v. Cisneros*, 37 F.3d
775, 798 (2d Cir. 1994) (citing *County of Riverside v.
McLaughlin*, 500 U.S. 44, 51-52 (1991)). Further, while the
mootness of the claims of some class representatives does not
moot a class action itself, *Robinson v. Sheet Metal Workers'
Nat. Pension Fund*, *Plan A*, 515 F.3d 93, 97 n.4 (2d Cir. 2008),
courts may dismiss individual class representatives whose
personal claims have been mooted. *Dodge v. County of Orange*,
103 Fed. Appx. 688, 690 (2d Cir. 2004) ("[N]amed plaintiffs in
[a class] action must themselves have standing . . . ."); *In re
Facebook Priv. Litig.*, 192 F. Supp. 3d 1053, 1058 (N.D. Cal.
2016) (putative class representative who lacked standing was
dismissed even though the action itself was not).

**B. Venue remains proper in this District despite the dismissal
of N-N and G-V-R, and transfer is not warranted**

Defendants contend that the Eastern District of New
York is no longer a proper venue for this action because the
claims of plaintiff N-N — the only named Plaintiff residing in
the District — are moot, and the action has no other meaningful
connection to this forum. Defs.' Br. at 13.

1. Venue

In a lawsuit brought under the APA, venue is governed
by 28 U.S.C. § 1391(e). Section 1391 provides that a suit

against the federal government or a federal official acting in his or her official capacity can be brought in any judicial district where (1) "a defendant in the action resides"; (2) "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or (3) "the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1).

Venue was proper at the time this case was filed because it was brought in the venue in which plaintiff N-N resided and venue is determined on the facts at the time a complaint is filed. *See Golberg v. United States*, No. 13-CV-7353, 2015 WL 5638008, at *3 (E.D.N.Y. June 4, 2015) ("When determining whether venue is proper, the relevant district to consider is plaintiff's residence as of the time of the filing of the complaint."). Further, once venue is established, it is not affected by subsequent events. *See Keitt v. New York City*, 882 F. Supp. 2d 412, 459 n.44 (S.D.N.Y. 2011) ("Venue is determined based upon the parties and allegations at the time the operative complaint is filed, not subsequent events."); *Holmes v. Energy Catering Servs., LLC*, 270 F. Supp. 2d 882, 885 n.1 (S.D. Tex. 2003) ("Under section 1391, venue is determined when the suit is filed and is not affected by subsequent events such as the dismissal of a defendant, as occurred here.");

*Dolgow v. Anderson*, 45 F.R.D. 470, 473 (E.D.N.Y. 1968) ("Like jurisdiction, venue once properly established, is unaffected by the change in parties, since it relates to the institution of the suit." (cleaned up)). Accordingly, venue is proper in this District notwithstanding the dismissal of N-N.

    2.   <u>Transfer</u>

      In the alternative, Defendants request that the case be transferred to the District of Columbia pursuant to 28 U.S.C. § 1404. Under Section 1404, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C § 1404(a). "[M]otions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir. 1992).

      The party moving for a transfer of venue has the burden of demonstrating by "clear and convincing evidence" that the transfer is appropriate. *New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 113-14 (2d Cir. 2010). The district court must first determine whether the lawsuit "might have been brought" in the forum where the defendant seeks to transfer the case. 28 U.S.C. § 1404(a). If this threshold inquiry is satisfied, the court then evaluates "both private

interest factors that pertain to the effect of a transfer on those concerned with the specific dispute in question and public interest factors that relate to judicial economy and systemic fairness." *W. Watersheds Project v. Tidwell*, 306 F. Supp. 3d 350, 356 (D.D.C. 2017) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30 (1988)).

The Second Circuit has identified several non-exclusive factors to be considered in determining the parties' interests:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*Lafarge N. Am., Inc.*, 599 F.3d at 112 (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006)). Courts in the Second Circuit also consider "public interest[]" factors including "administrative difficulties that follow from court congestion," *New Son Yeng Produce, LLC v. A & S Produce, Inc.*, No. 07-CV-4292, 2009 WL 2568566, at *4 (E.D.N.Y. Aug. 19, 2009), and "the comparative familiarity of each district with the governing law," *Bank of Am., N.A. v. Wilmington Tr. FSB*, 943 F. Supp. 2d 417, 426 (S.D.N.Y. 2013). In their motion papers, Defendants contend that a transfer to the District of Columbia is warranted because Defendants are located there, as is counsel

18

for both parties; the operative events occurred there, and in other fora outside of New York; and "nearly all" of the relevant documents, information, and potential witnesses can be found there.  Defendants' Reply Brief at 3, ECF No. 26.

These premises, however, do not all remain true at this point.  On January 13, 2021, in advance of oral argument, the Court issued an Order directing Defendants to submit additional affidavits or other materials relevant to the venue question.  *See* Order, ECF No. 30.  Defendants submitted a supplemental declaration attesting that all policy-level decision-making concerning the U visa program and related employment authorizations occurs at USCIS headquarters, as does the agency's decision-making about resource allocation.  *See* Declaration of Connie Nolan in Support of Defendants' Submission, dated January 19, 2021 at 1, ECF No. 31.  The agency went on to note that in December 2020, it relocated its headquarters from Washington, D.C. to Camp Springs, Maryland.  *See id.* ¶ 5.

Most of the evidence and potential witnesses will now be found in Maryland, not Washington, D.C.  While Camp Springs is relatively close to Washington, this factor no longer supports the government's transfer request to the extent it once did.  *See De Jesus v. Nat'l R.R. Passenger Corp.*, 725 F. Supp.

207, 208-09 (S.D.N.Y. 1989) (applying transfer factors differently even to neighboring cities).

The remaining factors are either neutral or favor Plaintiffs. New York is the Plaintiffs' chosen forum. While deference to their choice is "reduced" in a putative class action where "members of the class are dispersed throughout the nation," *Wald v. Bank of Am. Corp.*, 856 F. Supp. 2d 545, 549 (E.D.N.Y. 2012), it is nonetheless a factor that weighs against transfer here. No named Plaintiff resides in Washington, D.C. And the fact that both parties have counsel in D.C. is irrelevant, as "the convenience of counsel is not an appropriate factor to consider on a motion to transfer." *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 374 (S.D.N.Y. 2006). Defendants have not demonstrated by clear and convincing evidence that a transfer of venue from New York to D.C. would advance the convenience of the parties or the interest of justice.

Defendants also raised — for the first time at oral argument — a request that if the transfer to D.C. is denied, I should instead transfer the case to the District of Maryland. *See* Transcript of Oral Argument dated January 20, 2021 at 9:22-10:9, ECF No. 33. However, federal district courts generally reject arguments raised for the first time at oral argument. *See, e.g.*, *N.V.E., Inc. v. Palmeroni*, No. 06-CV-5455, 2017 WL

20

3917139, at *1 (D.N.J. Sept. 7, 2017) ("[Defendant] did not raise the . . . argument in his opposition papers . . .; he raised it for the first time at oral argument.  That is reason enough to reject it." (internal citation omitted)); *Baker v. Hopeman Bros., Inc.*, No. 11-CV-01646, 2012 WL 7761420, at *1 n.1 (E.D. Pa. Nov. 9, 2012) (declining to consider argument first raised at oral argument); *Nobel Ins. Co. v. City of New York*, No. 00-CV-1328, 2006 WL 2848121, at *16 (S.D.N.Y. Sept. 29, 2006) ("Normally, [the court] will not consider arguments raised for the first time in a reply brief, let alone [at or] after oral argument." (quoting *United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998)).  "This common practice promotes fairness and efficiency.  Last-ditch arguments thrown out pell-mell at a motion hearing deprive party-opponents of any reasonable opportunity to give a thoughtful, supported response." *Deseret Tr. Co. v. Unique Inv. Corp.*, No. 17-CV-00569, 2018 WL 8110959, at *4 (D. Utah July 3, 2018).  In any event, it is unclear that this case "might have been brought" in Maryland, as 28 U.S.C. § 1404(a) requires, because no defendant resided there when the case was filed.  *See* 28 U.S.C. § 1391(e)(1) (civil actions against federal agencies may be brought in any judicial district in which a defendant resides, among other places).

Accordingly, the motion to transfer is denied.

**C.    The Court lacks jurisdiction to review the claim that Defendants have failed to comply with 8 U.S.C. § 1184(p)(6) (Counts II & V)**

While a U visa application is pending, but before it is adjudicated, the Secretary of Homeland Security has authority to issue the applicant an EAD if the application is determined to be "bona fide," *see* 8 U.S.C. § 1184(p)(6) — this is Stage Two in the taxonomy above.  Plaintiffs contend that by refusing to render a determination as to whether a pending application is "bona fide," Defendants have unlawfully withheld and delayed required agency action, in violation of the APA.  *See* Compl. ¶¶ 155-62 (Count II) (asserting that Defendants violated the APA by refusing to adjudicate EAD applications for petitioners with pending, bona fide applications as contemplated in Section 1184(p)(6)); *see also id.* ¶¶ 178-84 (Count V) (seeking remedy under the Mandamus Act for the same violation alleged in Count II).

Defendants respond that the decision whether to grant the employment authorization contemplated by Section 1184(p)(6) is committed to the agency's discretion, and therefore not reviewable under the APA.  They invoke 5 U.S.C. § 701(a), which states that the APA does not apply to agency action that "is committed to agency discretion by law."  Defendants also rely on a provision in the INA, 8 U.S.C. § 1252(a)(2)(B)(ii), which states that "no court" shall have jurisdiction to review any

decision or action "of the . . . Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of" the Secretary.  Defendants claim that these provisions bar judicial review of the discretion Congress conferred in the Secretary through Section 1184.

The final sentence of Section 1184(p)(6) — on which these claims are based — says: "The Secretary may grant work authorization to any alien who has a pending, bona fide application for" U nonimmigrant status.  This language is plainly discretionary.  *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting that the use of "may" instead of "shall" in a statute implies a grant of discretion); *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) ("[W]hen the same Rule uses both 'may' and 'shall', the normal inference is that each is used in its usual sense — the one act being permissive, the other mandatory."); *see also Rastelli v. Warden, Metro. Corr. Ctr.*, 782 F.2d 17, 23 (2d Cir. 1986) ("The use of a permissive verb — 'may review' instead of 'shall review' — suggests a discretionary rather than mandatory review process.").

There is Supreme Court precedent suggesting that this should be the end of the analysis:  In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), the Court opined that "the only agency action that can be compelled under the APA is action legally *required*.  This limitation appears in [5 U.S.C.]

§ 706(1)'s authorization for courts to 'compel agency action *unlawfully* withheld.'" *Id.* at 63. The *Southern Utah Wilderness Alliance* opinion went on to note that "delay cannot be unreasonable with respect to action that is not required." *Id.* at 63 n.1.

Plaintiffs contend, however, that even if the decision to "grant work authorization" is discretionary, the agency's obligation to determine the "bona fide" status of an application is not. Put differently, Plaintiffs are arguing that even if they are not entitled to EADs in Stage Two, they are entitled to a prompt *determination of their EAD eligibility* — i.e., whether their application is bona fide under Section 1184(p)(6). Pls.' Br. at 19. For that proposition, they invoke *INS v. St. Cyr*, 533 U.S. 289 (2001), in which the Supreme Court held that when eligibility for a benefit is "governed by specific statutory standards," there exists "a right to a ruling on an applicant's eligibility," even though the relief itself is "a matter of grace." *Id.* at 307-08.

By its terms, however, *St. Cyr*'s "right to a ruling" applies only when the law in question sets out a precondition to the exercise of discretion, and that precondition is expressed in a "specific statutory standard." *Id.* Accordingly, this Court must determine whether the statement that applicants with "pending, bona fide" petitions are eligible for discretionary

EAD grants, *see* 8 U.S.C. § 1184(p)(6), constitutes a "specific statutory standard" within the meaning of *St. Cyr*.

I am constrained to conclude that the term "bona fide" does not constitute the kind of specific statutory standard that could be held to require a determination under *St. Cyr*. There is simply nothing specific about the phrase "bona fide," as used in this context. "Specific" means "characterized by precise formulation," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2187 (2020); "definite," RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1832 (1987); "[p]recisely formulated," WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY 2414 (1946); and "free from ambiguity," MERRIAM-WEBSTER DICTIONARY.[6] The relevant passage in Section 1184(p)(6) is none of these things, and Congress has provided no additional guidance beyond that passage.

Several other courts have reached the same conclusion. As one judge in the District Court for the District of Columbia put it, "[t]he only requirement in [Section 1184] relating to the grant of [an] EAD is that the U-visa application must be pending and 'bona fide,' [but] what this means is not defined by statute or regulation." *Uranga v. U.S. Citizenship & Immigr. Servs.*, 490 F. Supp. 3d 86, 100 (D.D.C. 2020). The *Uranga* court went on to observe that "bona fide" could refer either "to

---

[6] https://www.merriamwebster.com/dictionary/specific (last visited May 5, 2021).

petitions made in 'good faith' or applications that are generally in order," among other things. *Id.* Ultimately, "it is not clear what Congress meant, and there are no regulations implementing this part of the statute." *Id.* Thus, the *Uranga* court concluded, "the provision does not provide the 'specific statutory standards' contemplated by the Supreme Court by which the agency must act to issue work authorization documents." *Id.*

Likewise, in *Patel v. Cissna*, 400 F. Supp. 3d 1373, 1380-81 (M.D. Ga. 2019), the court concluded that "bona fide" is not a specific statutory standard:

> Congress did not specifically state what the single "eligibility" requirement, "bona fide," meant. It is not defined in the statute . . . . Even if there is some general principle that when Congress specifically enumerates eligibility requirements, it presumptively intended for the agency to develop a process for determining whether those requirements have been met, § 1184(p)(6) is not the poster child for the application of this principle.

The *Patel* court went on to conclude that "Congress's loose 'eligibility' requirement" was "consistent with an intent to vest the Secretary with maximum discretion." *Id.* at 1381; *see also id.* at 1376 (agreeing with the government that this conferral of discretion includes the "right not to process pre-waiting list work authorization claims").

The Fourth Circuit reached the same conclusion recently in *Gonzalez v. Cuccinelli*, 985 F.3d 357 (4th Cir. 2021). There, the panel held that "Congress did not mandate

implementation of § 1184(p)(6), much less mandate adjudication of the benefits it contemplates." *Id.* at 370. The court found that Congress did not provide a specific statutory standard to interpret what "bona fide" means in Section 1184(p)(6). The court noted that "several circuits, including our own, have rejected that such broad 'standards' render decisions reviewable." *Id.* (citing cases in the D.C., Third, and Fourth Circuits); *see also Butanda v. Wolf*, No. 20-CV-01155, 2021 WL 327714, at *5 (D. Colo. Feb. 1, 2021) (finding that Section 1184(p)(6) requires no discrete agency action by the Secretary that would cabin his discretion and "bring it within the ambit of Section 706(1)").

Courts have held similarly vague language in other statutes to fall short of the *St. Cyr* standard. In *Mousavi v. U.S. Citizenship & Immigration Services*, for example, the Third Circuit considered a provision of immigration law affording the executive branch discretion to grant work authorization to certain applicants so long as the Attorney General deemed such a grant to be "in the national interest." 828 F. App'x 130, 132-33 (3d Cir. 2020) (quoting 8 U.S.C. § 1153(b)(2)(B)(i)). Plaintiff Mousavi argued that the agency owed her a determination as to whether her application was in the national interest, even if she was not entitled to work authorization itself. *Id.* at 133-34. The Court of Appeals rejected this

argument, observing that Congress offered no definition of the term "national interest" and did not "set forth any guideposts" for applying the term. *Id.* at 133; *see also Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005) (reaching the same conclusion).

This Court is persuaded by the reasoning of *Uranga, Gonzalez*, and these other cases. There is simply insufficient definitional content in the phrase "bona fide" to compel agency action in the context of a statute that is framed, on its face, as discretionary.

One court in this District has reached the opposite conclusion on this same language. *Rodriguez v. Nielsen*, No. 16-CV-7092, 2018 WL 4783977, at *15 (E.D.N.Y. Sept. 30, 2018) (finding that USCIS has a duty to adjudicate EAD applications pursuant to Section 1184(p)(6)). The *Rodriguez* court noted — persuasively — that USCIS *could* opt to graft specific definitional content onto the "bona fide" standard in Section 1184(p)(6) if it chose, and indeed that USCIS actually has provided such definitional content for the same phrase, as used in a different context. *Id.* at *11-12. Specifically, *Rodriguez* observed that USCIS has adopted regulations relating to the issuance of T visas, providing that an application should be considered bona fide once it "has been initially reviewed and determined that the application does not appear to be

28

fraudulent, is complete and properly filed, includes completed
fingerprint and background checks, and presents prima facie
evidence of eligibility." *Id.* at *11 n.15 (quoting 8 C.F.R.
§ 214.11(a)). "[N]othing," *Rodriguez* continued, "prevents USCIS
from promulgating such a regulation in the U Visa context." *Id.*
at *11.

I agree that USCIS could, if it chose, graft
sufficient specifics on to the skeletal "bona fide" standard in
Section 1184(p)(6). But as I read *St. Cyr*, the question is not
whether USCIS *could* do so, but whether *Congress has* done so in
Section 1184 itself. *See St. Cyr*, 533 U.S. at 290, 307-08
(speaking of a right to a ruling as to "[e]ligibility that *was*
governed by specific statutory standards" (emphasis added)
(internal quotation marks omitted)). Congress has not done so
here, and accordingly I conclude that it left the agency
discretion to implement its discretionary authority under
Section 1184(p)(6) — or not. *E.g., Gonzalez v. Cuccinelli,* 985
F.3d at 371 (because Congress has not provided a specific
statutory standard, the "decision to adjudicate remains
discretionary").

Plaintiffs attempt to distinguish *Uranga* et al. on the
basis that some of those decisions expressed doubt that *St. Cyr*
even applies to Section 1184(p)(6), given that *St. Cyr* arose in

the habeas context.  Pls.' Br. at 22.  That doubt is foreclosed

in this Circuit, Plaintiffs argue, because the Second Circuit

has expressly extended *St. Cyr*'s reach to the immigration

context.  *Id.*; *see Rodriguez v. Gonzales*, 451 F.3d 60, 62 (2d

Cir. 2006) (court had jurisdiction to review whether agency

correctly determined alien's eligibility for relief as defined

by statutory requirements, even though the actual granting of

relief was within the agency's discretion (citing *St. Cyr*, 533

U.S. at 307-08)).  But I do not reject the Plaintiffs' appeal to

*St. Cyr* on the ground that its holding is limited to the habeas

context.  Rather, for the reasons set forth above, I hold that

Section 1184(p)(6) simply does not constitute the type of

specific statutory standard that *St. Cyr* contemplated in its

"right to a ruling" analysis.  Therefore, I do not have the

authority to intercede in the agency's exercise of its

discretion.

Because the agency has no court-enforceable duty to

determine the "bona fide" status of pending applications, Counts

II and V must be dismissed.

**D.  Plaintiffs have failed to state a claim that USCIS unlawfully withheld agency action in violation of 8 C.F.R. § 214.14(d)(2) (Counts I & IV)**

Plaintiffs argue that even if the pre-waitlist

assessment of an application's "bona fide" status is committed

to agency discretion, the agency's ultimate adjudication of the

U visa petition itself is not.  They contend that the agency has

an obligation to complete the actual adjudication of U visa

petitions for placement on the waitlist more quickly than it is

currently doing.  (This is the progression from Stage Two to

Stage Three in the taxonomy above.)

This obligation arises, Plaintiffs assert, under

8 C.F.R. § 214.14(d)(2), which provides that "[a]ll eligible

petitioners who, due solely to the cap, are not granted U-1

nonimmigrant status must be placed on a waiting list and receive

written notice of such placement."  Waitlist status, as noted

above, brings with it a new basis for potential employment

authorization eligibility — this time under the agency's own

regulations, which provide that "USCIS, in its discretion, may

authorize employment" for wait-listed petitioners and certain

family members.  *Id.*

Plaintiffs allege that the slow pace at which the

Defendants have complied with that duty constitutes unreasonable

delay under the APA (Count I of the Complaint) and that a writ

of mandamus should issue to compel faster adjudication of

outstanding petitions (Count IV).

This argument requires the Court to address two

questions — first, whether the agency action sought in Counts I

and IV is compulsory or discretionary.  *See Southern Utah*

*Wilderness Association*, 542 U.S. at 63 n.1 ("[D]elay cannot be

unreasonable with respect to action that is not required").

Second — assuming the agency is required to provide this relief, on what timetable must it act (or, put differently, when has this action been "unreasonably delayed" under 5 U.S.C. §§ 555(b) and 706(1))?

As set forth below, the duty to adjudicate petitioners' eligibility for placement on the waitlist is non-discretionary, and the Court thus has jurisdiction to review it. Nevertheless, Plaintiffs have not stated a claim that such action has been unlawfully delayed.

1. The Court has jurisdiction to review the adjudication of Plaintiffs' eligibility for the U visa waitlist

The agency is required to adjudicate U visa petitions for placement on the waitlist. Therefore, the Court has jurisdiction to review agency action in this context.

USCIS regulations provide that "[a]ll eligible petitioners who, due solely to the cap, are not granted U-1 nonimmigrant status must be placed on a waiting list and receive written notice of such placement." 8 C.F.R. § 214.14(d)(2). The government does not dispute that this language is compulsory — not only as to placement on the waitlist once eligibility is determined, but also as to the eligibility determination itself. And in contrast to the "bona fide" standard discussed above, the standard in Section 214.14 governing eligibility is indeed

specific — subsection (b) of that regulation and 8 U.S.C.
§ 1101(a)(15)(U) lay out the eligibility standards for U visa
petitioners in detail. *See Uranga*, 490 F. Supp. 3d at 101
(holding that "while the outcome of the [U visa] eligibility
determination is a matter committed to the agency's discretion .
. . , the government must assess a petitioner's eligibility in
order to comply with the mandatory requirement to include
eligible applicants on the waitlist"); *Patel*, 400 F. Supp. 3d at
1384 ("There is no dispute that Defendants are required by law
to decide whether to place Plaintiff on the waiting list . . .
.").

Thus, Defendants must — at some point in time – decide
whether to place Plaintiffs on the U visa waitlist.
Accordingly, this Court has jurisdiction over this claim under
the APA.

2. Plaintiffs fail to state a claim for unreasonable
delay in connection with the determination of their
U visa and waitlist eligibility

As to the second question, Plaintiffs have not stated
a claim for unreasonable delay. Other courts have reached the
same conclusion with respect to USCIS's adjudication of U visa
applicants' eligibility for waitlist status. *See, e.g.*, *Patel
v. Cuccinelli*, No. 20-CV-101, 2021 WL 77459, at *11 (E.D. Ky.
Jan. 8, 2021); *Arguijo v. United States Dep't of Homeland Sec.*,
No. 20-CV-378, 2020 WL 7585809, at *5 (W.D. Mich. Dec. 16,

2020); *Uranga*, 490 F. Supp. 3d at 103-06.  For the reasons set forth below, I concur.

Although USCIS regulations do not establish a deadline by which the agency must determine whether a petitioner is waitlist-eligible, the APA provides that "within a reasonable time, each agency shall proceed to conclude a matter presented to it."  5 U.S.C. § 555(b).  And reviewing courts must "compel agency action unlawfully withheld or unreasonably delayed" under the APA.  5 U.S.C. § 706(1).

Unreasonable agency delay is measured according to the factors laid out in *Telecommunications Research & Action Center v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*").  *See, e.g.*, *Uranga*, 490 F. Supp. 3d at 102 (applying the *TRAC* factors); *Xiaobin Xu v. Nielsen*, No. 18-CV-2048, 2018 WL 2451202, at *1 (E.D.N.Y. May 31, 2018) (same).

The *TRAC* factors are:

(1) the time agencies take to make decisions must be governed by a rule of reason;

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature
and extent of the interests prejudiced by delay; and

(6) the court need not find any impropriety lurking
behind agency lassitude in order to hold that agency
action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (internal quotation marks and citations
omitted).

The Plaintiffs' claim of unreasonable delay is
predicated almost entirely on the following (largely undisputed)
contentions: (a) the time period to an eligibility adjudication
is long (currently about four-and-a-half years); (b) that period
has gotten longer over time, at a rate that outpaced the
increase in U visa petitions; and (c) the wait does not have to
be so long — USCIS could, if it chose, adjudicate eligibility
significantly more quickly. *See* Pls.' Br. at 8 (citing various
allegations from the Complaint). Plaintiffs also note that
USCIS has actually increased the resources it devotes to U visa
petitions; thus, Plaintiffs posit, the increasing delays cannot
"somehow [be] due to reduced staffing." *Id.* at 9. Instead, the
"natural inference," Plaintiffs assert, is that Defendants have
affirmatively "chosen not to comply with their own regulations."
*Id*.

It is settled, however, that the mere passage of time
cannot sustain a claim of unreasonable delay. *Mashpee Wampanoag
Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir.

2003).  Courts have held delays in the vicinity of five years in the adjudication of immigration benefits not to be unreasonable as a matter of law — both in the U visa context, *see Uranga*, 490 F. Supp. 3d at 102-06, and in the context of other immigration benefits, *see, e.g.*, *Yan Chen v. Nielsen*, No. 17-CV-7157, 2018 WL 1221130, at *2 (E.D.N.Y. Mar. 8, 2018) (delay of four-and-a-half years to adjudicate plaintiff's application for an adjustment of her immigration status to permanent resident did not justify APA or mandamus relief); *Saleh v. Ridge*, 367 F. Supp. 2d 508, 513 (S.D.N.Y. 2005) (delay of "almost five years" to adjudicate plaintiff's application for lawful permanent alien status was not unreasonable).

The *TRAC* factors set forth above require dismissal of this claim, for the reasons set out below.

> a.   Is the agency's timing subject to a rule of reason?

Certain courts have held the first *TRAC* factor — the "rule of reason" factor — to be the "most important."  *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012); *Uranga*, 490 F. Supp. 3d at 102-03.  Whether a rule constitutes a rule of reason "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the

significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee*, 336 F.3d at 1102; *Tate v. Pompeo*, No. 20-CV-3249, 2021 WL 148394, at *10 (D.D.C. Jan. 16, 2021) (quoting same). USCIS invokes its policy of reviewing U visa applications on a "first-in, first-out" basis as the relevant rule of reason here. 72 Fed. Reg. 53,014, 53,033–34 (USCIS shall "adjudicate petitions on a first in, first out basis"); *see also* 8 C.F.R. § 214.14(d)(2) ("Priority on the waiting list will be determined by the date the petition was filed with the oldest petitions receiving the highest priority.").

Courts reviewing similar challenges have held that processing first-filed petitions before later-filed petitions does indeed constitute a "rule of reason." *E.g.*, *Palakuru v. Renaud*, No. 20-CV-02065, 2021 WL 674162, at *4 (D.D.C. Feb. 22, 2021) (finding first-in, first-out process to be governed by a rule of reason); *Gonzalez v. Cissna*, 364 F. Supp. 3d 579, 585–86 (E.D.N.C. 2019) (same), *aff'd in part, vacated in part, remanded sub nom. Gonzalez v. Cuccinelli*, 985 F.3d at 375; *A.C.C.S. v. Nielsen*, 18-CV-10759, 2019 WL 7841860, at *4 (C.D. Cal. Sept. 17, 2019) (processing U visa petitions "from first-filed to last-filed" constitutes a "rule of reason").

Plaintiffs respond that they are not challenging the existence of a first-in, first-out protocol, but instead

Defendants' "failure to process petitions — *in the order received* — within a reasonable time." Pls.' Br. at 13. In essence, Plaintiffs do not dispute that the operative protocol could constitute a rule of reason; they simply prefer a swifter administration of that protocol. This preference may be understandable, given the important interests at stake. But for this Court to demand an accelerated protocol, I would have to intrude into a quintessentially administrative function, and in the process reconfigure the agency's priorities to advance more than 100,000 U visa petitioners at the expense of applicants who seek other benefits from the agency, such as every other type of immigrant- and non-immigrant visa, asylum, and other remedies. This "is something that this Court is institutionally ill-equipped to do." *Pesantez v. Johnson*, No. 15-CV-1155, 2015 WL 5475655, at *6 (E.D.N.Y., Sept. 16, 2015) (internal quotation marks omitted); *see also In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (holding that courts generally "have no basis for reordering agency priorities," given that the agency is "in a unique — and authoritative — position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way"). This first factor therefore weighs heavily in Defendants' favor.

b.　Has Congress provided a timetable?

Congress has not prescribed specific deadlines by
which USCIS should adjudicate a U visa petition.  At the same
time, Congress has unquestionably "provided . . . [an]
*indication* of the speed with which it expects the agency to
proceed."  *TRAC*, 750 F.2d at 80 (emphasis added).  It has done
so by slowing the issuance of U visas through the enactment of
the annual cap of 8 U.S.C. § 1184(p)(2)(A).  In asserting that
Congress directed faster processing, Plaintiffs invoke certain
legislative history associated with the statutory provisions at
issue — specifically, an "explanatory statement" read into the
record by two members of the House of Representatives.  Pls.'
Br. at 15 (citing 154 Cong. Rec. H10,888, 10,905 (Dec. 10, 2008)
(statement of Reps. Berman & Conyers), 2008 WL 5169865).  But
the congressional timetable contemplated by this *TRAC* factor
will emerge through actual statutory pronouncements (such as the
statutory cap), rather than such faint signals as the
explanatory statement.  *See, e.g.*, *N.L.R.B. v. SW Gen., Inc.*,
137 S. Ct. 929, 943 (2017) ("[F]loor statements by individual
legislators rank among the least illuminating forms of
legislative history."); *see also Exxon Mobil Corp. v. Allapattah
Servs., Inc.*, 545 U.S. 546, 568–69 (2005) ("As we have
repeatedly held, the authoritative statement is the statutory
text, not the legislative history or any other extrinsic

material."). Given Congress's enactment of the annual cap on
U visa issuance, this factor, too, weighs heavily in favor of
Defendants.

      c.   Are human health and welfare at stake?

This factor weighs in Plaintiffs' favor, given the
importance of being able to work and receiving protection from
removal. *A.C.C.S.*, 2019 WL 7841860, at *5. While delays "in
the sphere of economic regulation" are more tolerable than those
affecting human health and welfare, *TRAC*, 750 F.2d at 80,
employment is usually not purely economic. Plaintiffs allege
that petitioners may struggle to support themselves and/or their
families because they cannot obtain lawful employment without
EADs and may, as a result, have difficulty finding a safe place
to live or paying medical bills for themselves or family
members. *See* Compl. ¶¶ 69, 85, 90, 100, 130. But "agency
action that fails to achieve optimal output" — even where, as
here, health and welfare are at stake — "does not automatically
justify court intervention." *Agua Caliente Band of Cahuilla
Indians v. Mnuchin*, No. 20-CV-01136, 2020 WL 2331774, at *7
(D.D.C. May 11, 2020); *see also Arguijo*, 2020 WL 7585809, at *1
(even where human health and welfare are at stake, these costs
"[do] not by [themselves] render the delay in this case
unreasonable"). On balance, however, this is the one *TRAC*
factor that weighs in Plaintiffs' favor.

d. Effect of an expediting order on other agency priorities

The fourth *TRAC* factor has also been described as critical — indeed, by one court as the "most relevant" to the APA assessment of delay in the U visa context, as well as potentially the "most fatal." *See Gonzalez v. Cissna*, 364 F. Supp. 3d at 585. This factor weighs strongly in favor of Defendants here because expediting the delayed action would essentially allow Plaintiffs to "jump the line," resulting in the redistribution of agency resources but no agency-wide net gain. *See Mashpee*, 336 F.3d at 1100 (the court should "refuse[] to grant relief, even though all the other factors considered in *TRAC* favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain" (cleaned up)); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 192 (D.C. Cir. 2016) (collecting cases "reject[ing] mandamus claims that would have had the effect of allowing the plaintiffs to jump the line, functionally solving their delay problem at the expense of other similarly situated applicants"); *Barr Laboratories*, 930 F.2d at 75-76 (concluding that courts "have no basis for reordering agency priorities"); *Yan Chen*, 2018 WL 1221130, at *2 (holding that this factor disfavored plaintiff because the effect of prioritizing her

application would have come at the expense of others); *Xiaobin Xu*, 2018 WL 2451202, at *2 (same).

The *Mashpee* court noted that where, as here, there is "no evidence . . . that officials not working on [the petitioners'] matters were just twiddling their thumbs," plaintiffs should not be able to accelerate their quest for relief. 336 F.3d at 1100-01 (cleaned up). Other cases recognize that agencies like USCIS must "juggle competing duties," and that courts should hesitate to reorder their priorities where the claimed injury — delay — would simply fall on another constituency if alleviated in the instant context. *Xiaobin Xu*, 2018 WL 2451202, at *2 (quoting *Mashpee*, 336 F.3d at 1101). Here, ordering the agency to move U visa petitioners — even *all* U visa petitioners — to the head of the agency's processing line would interfere with the agency's "authoritative" position to "allocate its resources in the optimal way." *Barr Laboratories, Inc.*, 930 F.2d at 75-76; *see also Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (holding that an agency "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"). Specifically, even if this Court mandated the agency to expedite review of all U visa petitions, the inevitable result would be the slowing of other requests for

relief from the agency.  This critical factor, too, thus strongly favors the Defendants.

> e.  Nature and extent of the interests prejudiced by delay

As noted above, other courts have routinely found, as a matter of law, that delays of this "extent" are not unreasonable.  *Uranga*, 490 F. Supp. 3d at 102-06 (delay of over four years to review U visa application was not unreasonable); *see also, e.g.*, *Yan Chen*, 2018 WL 1221130, at *2 (delay of over four years to adjudicate plaintiff's application for an adjustment of her immigration status to permanent resident did not justify APA or mandamus relief); *Saleh*, 367 F. Supp. 2d at 513 (delay of "almost five years" to adjudicate plaintiff's application for lawful permanent alien status was not unreasonable).

And given the 10,000-visa statutory cap, the delay here is rendered more understandable, if anything, when the "nature and extent" of the interests at issue are taken into account.  *TRAC*, 750 F.2d at 80.  The reality is that even if USCIS is acting on a long timetable for U visas, it is still adjudicating petitions substantially *sooner* than its action can be made effective, in light of the cap.  The instant fact pattern raises the question:  how can allegations of a fifty-four month processing time constitute "unreasonable delay" in a

process that, because of Congressional decree, cannot yield the intended result for approximately fourteen years?[7]

Plaintiffs answer this question entirely by reference to a secondary benefit accruing from waitlist status: the provision that the agency "in its discretion, may authorize employment" to waitlisted applicants. 8 C.F.R. § 214.14(d)(2). Thus, even if a writ of mandamus would not bring faster access to a U visa, it would bring important collateral benefits: most importantly, according to the Complaint, the ability to obtain the possibility of employment authorization.[8]

This appeal to the *possibility* of *discretionary* relief is an attenuated basis on which to complain about agency delay. Plaintiffs do not dispute that the agency is acting to complete the adjudicatory process long before the core relief sought through that process — the U visa — can actually be granted. Instead, they demand faster eligibility adjudication because it could lead, in turn, to a *discretionary* decision on certain

---

[7] Plaintiffs allege that there are more than 140,000 pending petitions at this point. *See* Compl. ¶ 5. At 10,000 visas issued per year, that obviously implies a wait significantly well in excess of ten years. *Id.* ¶ 44. Plaintiffs do not dispute that the waiting period to receive a U visa is longer than the fifty-four months it allegedly takes to be placed on the waitlist.

[8] Plaintiffs also note that waitlisted applicants receive certain protections against deportation. These protections are obviously primary, rather than secondary, benefits emanating from the eligibility-and-waitlist determination. But in alleging prejudice to their interests, Plaintiffs focus overwhelmingly on their need for EADs rather than the need for protection against deportation. Indeed, the Complaint does not allege that any Plaintiff faces imminent deportation.

secondary benefits.  This important *TRAC* factor thus does not provide much leverage for the Plaintiffs' APA claim.  *Arguijo*, 2020 WL 7585809, at \*4 (costs incident to U visa delays do not by themselves "render the delay . . . unreasonable").

For the foregoing reasons, Defendants' motion to dismiss Counts I and IV is granted.

**E.    Plaintiffs have stated a claim for Defendants' failure to issue interim EADs in accordance with former 8 C.F.R. § 274a.13(d) (Counts III & VI)**

Certain Plaintiffs — a proposed sub-class — also seek to compel Defendants to adjudicate their EAD applications pursuant to a previous version of 8 C.F.R. § 274a.13(d).  Until January 17, 2017, Section 274a.13(d) had set a specific deadline for USCIS to adjudicate EAD requests, and had obligated the agency to issue interim EADs if it failed to meet the deadline. That version of the regulation read as follows:

> *Interim employment authorization.*  USCIS will adjudicate the application within 90 days from the date of receipt of the application . . . .  Failure to complete the adjudication within 90 days will result in the grant of an employment authorization document for a period not to exceed 240 days.

8 C.F.R. § 274a.13(d) (repeal effective January 17, 2017).  The regulation was revised in January 2017 to eliminate both the ninety-day processing deadline and the mandate to issue interim EADs when applications were not adjudicated within that period.

The Plaintiffs bringing this claim allege that Defendants' failure to comply with USCIS's own prior regulation constitutes agency action "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1), and that this failure is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A) (Count III). These Plaintiffs filed U visa applications, *and* applied for employment authorization as then permitted, *and* saw more than ninety days elapse without an EAD being granted. Compl. ¶ 63. They allege that they are entitled a writ of mandamus ordering USCIS to issue them EADs pursuant to the prior regulation (Count VI).

The government makes two arguments in response — first, that the former regulation, *even while* it was in effect, did not compel the agency to issue EADs to petitioners before their U visa eligibility had been determined. *See* Defs.' Br. at 27, 29. And second, Defendants argue that the newer, post-January 17, 2017 rule should be applied retroactively — i.e., to EAD applications that were pending when it came into effect. *Id.* at 28-29. I take these arguments in turn below. For the reasons set forth, I conclude that Plaintiffs whose petitions had been pending for more than ninety days as of January 17, 2017 have stated a valid claim to relief under the former regulation, and therefore deny in part the motion to dismiss.

1.  Former 8 C.F.R. § 274a.13(d) compelled issuance of
    employment authorization documents before U visa
    eligibility had been determined

Defendants argue, first, that even in its previous

incarnation, Section 274a.13(d) did not entitle applicants to

adjudication of their EADs within ninety days of the U visa

application.  Instead, they contend that the ninety-day clock

began to run only once USCIS determined an applicant eligible

for the waitlist, rather than when the application was filed.

Because USCIS never placed these Plaintiffs on the waitlist,

they argue, the ninety-day clock never started.  This reading

may make eminently good sense from a policy perspective: it does

seem far-fetched that the agency would review EAD applications

for applicants whose underlying visa eligibility had not been

determined, and it seems equally unlikely that USCIS would

expect to resolve both issues on so short a timetable.  But

whatever sense it makes, this reading is clearly at odds with

the older regulation's plain text.  *Cf., e.g.*, *United States v.*

*Tohono O'Odham Nation,* 563 U.S. 307, 317 (2011)

("[C]onsiderations of policy divorced from the statute's text

and purpose could not override its meaning.").

The former 8 C.F.R. § 274a.13(d) stated unambiguously

that "USCIS will adjudicate the application within 90 days from

the date of receipt."  It did not say that USCIS would

adjudicate the application within ninety days of a threshold

47

determination of the petitioner's eligibility for an EAD, nor did it limit the applicability of the ninety-day clock to those petitioners with a "current basis" for employment authorization. For this reason, courts have held that the regulation unambiguously required adjudication of U visa petitioners' EAD applications within ninety days. *See, e.g.*, *Uranga*, 490 F. Supp. 3d at 108 (concluding that Defendants' interpretation of the regulation had "no support in its plain language"); *Rodriguez*, 2018 WL 4783977, at *19 ("Defendants cannot convincingly argue that the language in section 274a.13(d) is ambiguous."). I agree; these Plaintiffs were entitled to resolution of their EAD applications within ninety days of applying.

2. Revised 8 C.F.R. § 274a.13(d) may not be applied <u>retroactively</u>

Defendants argue, next, that the new regulation — which repealed the ninety-day deadline — should be applied to applications pending before its effective date.

The Supreme Court has generally "declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent" to do so. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994). Express congressional authorization is important, in part, because "[t]he power to require readjustments for the past is drastic. It . . . ought

not to be extended so as to permit unreasonably harsh action without very plain words." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (quoting *Brimstone R. Co. v. United States*, 276 U.S. 104, 122 (1928)); *see also Landgraf*, 511 U.S. at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."). Therefore, "administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen*, 488 U.S. at 208; *see also, e.g.*, *Samuels v. Chertoff*, 550 F.3d 252, 260 (2d Cir. 2008).

This rule is not absolute, however, as the Supreme Court explained in *Landgraf*. While the Court has long adhered to a presumption against retroactivity, it has also "for just as long . . . recognized that, in many situations, a court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit." *Landgraf*, 511 U.S. at 273-74 (internal quotation marks and citations omitted). To do so would be "unquestionably proper" where, for example, the new law "authorizes or affects [only] the propriety of prospective relief" in which the plaintiff has no "vested right." *Id.*

Where, as here, an administrative rule is at issue, the retroactive-intent inquiry is two-fold: whether Congress expressly conferred power on the agency to promulgate rules with retroactive effect and, if so, whether the regulation itself clearly provides for retroactive effect. *Bowen*, 488 U.S. at 208. If these tests are not both satisfied, the question becomes whether (as Defendants urge) the new regulation may be applied retrospectively anyway, because it interferes with no "vested rights."

Here, the two-fold test is failed at both steps. "[T]here is no provision in the immigration statutes that explicitly authorizes the agency to promulgate retroactive rules, and defendants do not contend otherwise." *Uranga*, 490 F. Supp. 3d at 107; *see also* 81 Fed. Reg. 82,398, 82,404-05 (setting out the authorizing legislation without any discussion of retroactivity). And the implementing regulations issued under those statutes do not contemplate retroactivity. *See* 81 Fed. Reg. at 82,398 (setting out the effective date of 8 C.F.R. § 274a.13(d) without suggesting it applies retroactively); *Samuels*, 550 F.3d at 260 ("A regulation or law, which, like this one, simply gives an effective date, does not give a clear indication that it is to have retroactive effect.").

Defendants do not argue that Congress gave such an indication. Rather, they contend that the new regulation may be

applied to pre-2017 petitions because its retrospective application would deprive no Plaintiff of "vested rights." *Landgraf*, 511 U.S. at 274.

A regulation is only *impermissibly* retroactive if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Id.* at 269 (internal quotation marks and citations omitted); *see also Samuels*, 550 F.3d at 260 (applying this test to a regulation); *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999) (same). An individual's "vested right" is an "immediate fixed right of present or future enjoyment," rather than an "inchoate expectation[] [or] unrealized opportunity[y]." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 44 n.10 (2006) (internal quotation marks omitted).

Plaintiffs O-D-B, I-M-R, Y-L-P, Z-M-A, M-D-M, and E-S-R applied for U visas and employment authorization documents prior to January 17, 2017.[9] Compl. ¶ 164. With the exception of O-D-B, these Plaintiffs' rights under former 8 C.F.R.

---

[9] O-D-B applied on December 2, 2016, Compl. ¶ 70; I-M-R applied on September 16, 2016, *id.* ¶ 82; Y-L-P applied on December 8, 2015, *id.* ¶ 101; Z-M-A applied on February 16, 2016, *id.* ¶ 106; M-D-M applied on January 20, 2016, *id.* ¶ 116; and E-S-R applied on January 11, 2016, *id.* ¶ 126. Plaintiffs N-N and G-V-R also applied prior to January 17, 2017, but as discussed *supra*, their claims are moot and therefore dismissed.

§ 274a.13(d) clearly vested before the current regulation took effect. Each of them checked "yes" in the box on their Form I-918 that asked if they wanted an EAD. If the ninety-day clock applied to their applications (which, as discussed above, it does), then these petitioners had the right to have their EAD requests adjudicated on that timetable, or to receive interim EADs. Because all but one of these Plaintiffs (O-D-B) had an application pending for longer than ninety days by the time the revised rule went into effect, their "immediate, fixed right" to interim work authorization documents was vested.[10] *See* 8 C.F.R. § 274a.13(d) ("Failure to complete the adjudication within 90 days *will* result in the grant of an employment authorization document for a period not to exceed 240 days.") (emphasis added). Applying the revised rule retroactively would "take away or impair" those rights. *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (cleaned up); *see also Uranga*, 490 F. Supp. 3d at 108 (holding that the right to an EAD under the prior regulation had

---

[10] Since O-D-B applied on December 2, 2016, Compl. ¶ 70, she had no vested entitlement to interim employment authorization when the revised regulation went into effect. *See BellSouth Telecomms., Inc. v. Se. Tel., Inc.*, 462 F.3d 650, 660-61 (6th Cir. 2006) (stating that "filing an application with an agency does not generally confer upon the applicant an inviolable right to have the agency rule on the application pursuant to the regulations in effect at the time of filing"); *Pine Tree Med. Assocs. v. Sec'y of Health & Human Servs.*, 127 F.3d 118, 121 (1st Cir. 1997) (holding that "the mere filing of an application is not the kind of completed transaction in which a party could fairly expect stability of the relevant laws as of the transaction date"); *Chadmoore Commc'ns, Inc. v. F.C.C.*, 113 F.3d 235, 241 (D.C. Cir. 1997) (citing cases holding that no rights vest upon the mere filing of an application with an administrative agency). Accordingly, this claim is dismissed as to O-D-B.

vested).  As a result, the regulation cannot be applied

retroactively to these Plaintiffs.

Defendants respond that these Plaintiffs could not

have "reasonabl[y] reli[ed]" on the prospect of receiving

interim EADs within ninety days, and that this lack of

reasonable reliance defeats their vesting.  They argue that

"USCIS has never issued interim work authorization to

individuals in [Plaintiffs'] circumstance."  Defs.' Br. at 28.

But there is no reason to believe Plaintiffs "knew, or could

have known, of this unstated USCIS policy," such that they

"could not rely on the plain language" of the regulation then in

effect.  *Rodriguez*, 2018 WL 4783977, at *19.  Indeed, the

application form these Plaintiffs submitted gave no such

indication.[11]

---

[11] When the ninety-day clock was in effect, a U visa petitioner could
request employment authorization documents on the face of Form I-918 by
checking the "yes" box in response to a prompt stating:  "I want an
Employment Authorization Document."  *E.g.*, Compl. ¶ 34.  This form contained
no indication that the timeline for evaluating EAD applications bore any
relation to the applicant's request for a U visa.  As USCIS explained at the
time:

> USCIS has designed the Form I-918 so that it serves the dual purpose
> of requesting U nonimmigrant status and employment authorization to
> streamline the application process.  Therefore, principal aliens
> will not have to file additional paperwork to obtain an initial
> EAD.

*See* New Classification for Victims of Criminal Activity; Eligibility for "U"
Nonimmigrant Status, 72 Fed. Reg. 53014-01 (Sept. 17, 2007).

At least one other court has reached a different
conclusion on this issue.  Earlier this year, the Fourth Circuit
concluded that since 2014 (i.e., before the Plaintiffs applied
for U visas), USCIS had "made clear that the 90-day adjudication
period" did "not begin until" the petitioner was "placed on the
waiting list." *Gonzalez,* 985 F.3d at 372.  But the USCIS
document the Fourth Circuit cited for this proposition was dated
February 7, 2017 — three years after this policy purportedly
took effect, and after the relevant period here.  *See id.*
(referring to ECF No. 57-3).  The Fourth Circuit may have
considered another document that bridged this gap; but that
document is not before me here (even assuming I could take
judicial notice of it at this stage).[12]  Because this record is
entirely opaque regarding the agency's pre-2017 directives on
this issue, dismissal of Counts III and VI remains inappropriate
on this basis, on this record (pending discovery, of course).

---

[12] The Defendants in this case do invoke Form I-918 for the proposition
that "USCIS has made clear that the 90-day adjudication period for the Form
I-765 under 8 C.F.R. 274a.13(d)(2011) did not begin until after the threshold
determination on the underlying benefit had been made."  Defs.' Br. at 29.
But they do not say *when* USCIS made that clear, and whether it was before
January 2017 or not.  They appear to be quoting a document entitled
"Instructions for Petition for U Nonimmigrant Status and Supplement A,
Petition for Qualifying Family Member of U-1 Recipient" as saying an
"application for employment authorization based on deferred action can only
be approved after DHS has deferred action" in a petitioner's case,
"regardless of when the Form I-765 is filed."  *Id.*  But they offer no
indication that this guidance was provided prior to 2017.  Instead, they cite
a version of the I-918 instructions that was "updated April 24, 2019," and
"last visited [on the web] March 30, 2020."  *See id* at 29 & n.21.

In arguing that no vested rights have been disturbed, Defendants rely on *Durable Manufacturing Co. v. U.S. Dep't of Labor*, 578 F.3d 497, 503 (7th Cir. 2009), for the proposition that "[t]he filing of an application for an administrative benefit does not create a vested right in that benefit." Defs.' Br. at 28. But *Durable* is inapposite. In *Durable*, the Seventh Circuit considered a revised regulation promulgated by the Department of Labor, which effectively invalidated labor certifications that had been approved before the new regulation went into effect. The prior regulation — in effect when the labor certifications were granted — had provided that they would be "valid indefinitely." 578 F.3d at 500, 504 (citing 20 C.F.R. § 656.30). Thus, the holding of *Durable* turned on the meaning of the word "indefinitely." Indefinitely does not mean permanently, the court held; instead, it means "so long as no definite period of validity was fixed" by the agency — in other words, until further notice. *Id.* Because the applicants in *Durable* had no legitimate expectation that their certifications would be permanent, they had no vested rights to begin with. *Id.*

Former 8 C.F.R. § 274a.13(d), in contrast, specifically guaranteed Plaintiffs the right to have their applications for work authorization adjudicated within ninety days, or required issuance of EADs: "Failure to complete the

adjudication within 90 days will result in the grant of an
employment authorization document for a period not to exceed 240
days." This passage contains no conditional language like the
word "indefinitely" to suggest that the entitlement at issue
would inure only at the pleasure of the agency. In fact,
specific time periods are mapped out in the text of the
regulation itself. Plaintiffs here therefore had, unlike the
plaintiffs in *Durable*, a vested right to receive the benefits at
issue.

Accordingly, the plaintiffs whose petitions had been
pending for over ninety days as of January 17, 2017 have stated
a claim that agency action has been unlawfully withheld. The
motion to dismiss Counts III and VI of the Complaint must be
denied as to all plaintiffs in that sub-class except O-D-B,
whose claims on these counts are dismissed because her
application had been pending for fewer than ninety days when the
revised rule went into effect.

## V.    Conclusion

For the reasons set forth above, Defendants' motion to dismiss Plaintiffs' First, Second, Fourth and Fifth Causes of Action is granted.  Defendants' motion to dismiss Plaintiffs' Third and Sixth Causes of Action is denied, except that plaintiff O-D-B's claims under the Third and Sixth Causes of Action are dismissed.  The claims of N-N and G-V-R are also dismissed as moot.  The Clerk of Court is respectfully directed to substitute the following defendants in the case caption: Alejandro Mayorkas for Kevin McAleenan; Tracy Renaud for Kenneth Cuccinelli; Connie Nolan for Donald Neufeld; and Merrick Garland for William Barr.

SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:    May 18, 2021
          Brooklyn, New York